**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

DONALD LOWE #172232,

    *Plaintiff*,

v.

PRISON HEALTH SERVICES,
and EDELMAN, DR.,

    *Defendants*.[1]
_____/

CASE NO. 4:13-CV-10058

DISTRICT JUDGE TERRENCE G. BERG
MAGISTRATE JUDGE PATRICIA MORRIS

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION TO DISMISS**
(Doc. 40)

**I.  RECOMMENDATION**

For the reasons presented below, **IT IS RECOMMENDED** that Defendants' motion to dismiss (Doc. 40) be **DENIED.**

**II.  REPORT**

    **A.  Introduction**

Plaintiff Donald Lowe filed this *pro se* prisoner civil rights action under 42 U.S.C. § 1983 on January 8, 2013. (Doc. 1.) Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth and Fourteenth Amendments by denying his requests to be treated by an outside medical specialist. (*Id.*) The events giving rise to this lawsuit occurred while Plaintiff was incarcerated at the Saginaw Correction Facility ("SRF"), in Freeland, Michigan.

---

[1] Defendant McCauley was terminated from the case on February 14, 2014 (Doc. 51) when the district judge adopted Magistrate Judge Michelson's Report and Recommendation; however, since Plaintiff's objections were not received prior to the adoption, Plaintiff has been given until August 8, 2014 to file his objections and he has done so. (Doc. 54.)  Therefore, the status of Defendant McCauley remains at issue.

Defendants contend that they are entitled to dismissal because Plaintiff failed to exhaust his administrative remedies. (Doc. 40.) Plaintiff responded (Docs. 44, 45, 46), and Defendants replied. (Doc. 48.) Therefore, the motion is ready for report and recommendation without oral argument. *See* E.D. Mich. LR 7.1(f)(1).

**B.     Standard of Review**

Although Defendants label their motion as one to dismiss and cite 11th Circuit authority to support the notion that dismissal is appropriate even when looking outside the pleadings toward the exhaustion requirement (Doc. 40 at 13-14), the court will consider the motion one for summary judgment. I note that Plaintiff has responded with an affidavit and other exhibits and suggested the motion should be considered one for summary judgment, so he will not be prejudiced by the court's construction. (Docs. 44, 45.)

A motion for summary judgment will be granted under Rule 56 of the Federal Rules of Civil Procedure when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has "'the initial burden of showing the absence of a genuine issue of material fact' as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v Catrett*, 477 U.S. 317, 323 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot rest merely on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-

2

moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court will rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992).

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### C.     Plaintiff's Complaint

Plaintiff alleges that in 2000, while housed at the SRF, he had serious medical problems with a swollen neck, which led to difficultly swallowing. (Doc. 1 at 2.) Plaintiff kited to see the prison doctor about his neck and was seen by Dr. Joseph Burtch. (*Id.*) Upon examination, Dr. Burtch placed a consultation request referral into Prison Health Services ("PHS")PHS for Plaintiff to see an endocrinology specialist. (*Id.*) The consultation request was granted and Plaintiff saw Dr. Orlandi at the Duane Waters Hospital in Jackson, Michigan. (*Id.*) After performing numerous tests (including a CT scan, blood tests, thyroid stimulating hormone (TSH) test, and an ultrasound), Dr. Orlandi diagnosed Plaintiff with multi-nodular goiter, with a diffusely enlarged thyroid. (*Id.*)

Plaintiff was transferred to the Robert Cotton Correctional Facility and, five months later, to the Mound Correctional Facility. (*Id.* at 2-3.) Upon his arrival at the Mound Correctional Facility,

3

Plaintiff was seen by the prison doctor there.  (*Id*. at 3.)  Plaintiff alleges that he "complained" for two-to-three years about his goiter and thyroid concerns, and that he needed to see an endocrinology specialist, "but to no avail."  (*Id*.)

On July 18, 2008, Plaintiff was taken to the emergency room at Detroit Receiving Hospital where he was diagnosed as having an enlarged thyroid.  (*Id*. at 3.) The discharge notes indicate a conversation with Dr. Middlebrook who indicated that the emergency room doctor "made it clear on the discharge instructions that [Plaintiff] needs endocrinology follow up, as well as ultrasound[,] [t]his will be able to be managed as an outpatient . . .  This patient is being discharged."  (*Id*. at 3-4.)

Plaintiff was then transferred from the Mound Correctional Facility to the Brooks Correctional Facility, where he was again seen by Dr. Orlandi, the endocrinology specialist.  (*Id*. at 4.)  Dr. Orlandi prescribed Tapazole and requested Plaintiff to follow-up in 12 weeks from July 22, 2009.  (*Id*.)  Shortly thereafter, Plaintiff was transferred back to the SRF and was seen by Dr. Burtch on September 11, 2009.  (*Id*.)  At this visit, Plaintiff requested an offsite visit to see Dr. Orlandi in the next two months.  (*Id*.)  On September 16, 2009, Dr. Adam Edelman denied this request indicating that Plaintiff would be treated onsite as appropriate.  (*Id*.; *see also* Ex. F, Edelmen Denial.)

On January 28, 2010, after being examined by Dr. Parveen Malik, Plaintiff made a second consultation request (referral) to PHS to see Dr. Orlandi, within four weeks of January 28, 2010. (Doc. 1 at 4.) Dr. Malik described signs and symptoms of Plaintiff's diagnosis and supporting history:

> Patient has a [history] of Bilateral Multinodular Goiter and was seen by Endocrinologist on July 22, 2009 at Duane Waters Hospital (DWH) clinic by Dr. Orlandi, (Endocrinologist) and [follow-up] after 3 months was recommended. Patient was placed on Tapazole 5 Mg three times per week. Patient has been []taking that since that time and his Goiter size has not improved and [has] <u>gotten worse</u> recently. Now he is complaining of difficulty swallowing & breathing problems at night, laying on his back wakes him up choking.

(Doc. 1 at 4-5) (emphasis in original).

4

On February 4, 2010, PHS denied the consultation request to see Dr. Orlandi. (*Id.*; *see also* Ex. H, PHS Denial.)

In April 2010, Plaintiff was transferred to Cooper Street Correctional Facility ("JCS"), where he continued to complain about his thyroid condition. (*Id.*) On December 8, 2011, and March 14, 2012, Plaintiff sent health care kites regarding his thyroid condition; specifically that he was having problems swallowing and breathing. (*Id.*) Despite his requests, Plaintiff has not seen endocrinology specialist Dr. Orlandi since his July 22, 2009 visit.

On November 23, 2009, Plaintiff filed a step I grievance where he claimed deliberate indifference to his serious medical needs, in violation of the Eight Amendment. (*Id.* at 5-6; *see also* Ex. K, step I grievance.) On December 7, 2009, he received a step I grievance response from Defendant McCauley (who also functioned as the Correctional Facility Health Unit Manager (HUM) in Saginaw) and M. Zamora. The response stated that their investigation revealed that Plaintiff had been seen by the medical provider on September 11, 2009, a consult request was placed for endocrinology specialist follow-up, but on September 16, 2009, after review by the Utilization Review representatives, it was recommended to treat Plaintiff onsite as appropriate, and the followup was not approved. (Doc. 1 at 5-6; *see also* Ex. L, response to step I grievance). On December 22, 2009, Plaintiff filed a step II grievance appeal, stating that the step I grievance response was not acceptable. (Doc. 1 at 6, Ex. M, step II grievance appeal.) On January 7, 2010, Plaintiff's appeal was denied, and the investigation determined that Plaintiff's issues were appropriately addressed at step I. (Doc. 1 at 6, Ex. N, step II grievance response.) The step II response further indicated that Plaintiff will continue to be monitored onsite by the facility medical provider for his thyroid condition. (*Id.*) On March 9, 2010, Plaintiff contends that he filed a step III grievance appeal to the director's office at P.O. Box 30003, Lansing, MI, but has not received a response to his step III appeal. (Doc. 1 at 6; *see also* Ex. O, step III appeal). Plaintiff filed this lawsuit on January 8, 2013. (Doc. 1.)

**D.     Exhaustion of Remedies Law, Background and Analysis**

   **1.     Exhaustion of Remedies: Governing Law and Policies**

Congress passed the Prison Litigation Reform Act of 1995 ("PLRA") "in response to a sharp rise in prisoner litigation in federal courts." *Woodford v. Ngo*, 548 U.S. 81, 83 (2006). By passing the PLRA, Congress attempted to ensure that "the flood of nonmeritorious [prisoner civil rights] cases [did] not submerge and effectively preclude consideration of the allegations with merit." *Jones v. Bock*, 549 U.S. 199, 202 (2007). Congress equipped the PLRA with several mechanisms designed to reduce the quantity and increase the quality of the claims that came to federal court. *Id.* A "centerpiece" of the PLRA was the "invigorated" exhaustion requirement: "No action shall be brought with respect to prison conditions under § 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (2000); *see also Woodford*, 548 U.S. at 84 ("A centerpiece of the PLRA's effort 'to reduce the quantity . . . of prisoner suits' is an 'invigorated' exhaustion provision.") (quoting *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). Courts consider the PLRA's suits 'brought with respect to prison conditions' to include "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532. The *Woodford* Court held that the PLRA's exhaustion of administrative remedies requires (1) that no remedies currently remain available, and (2) that the remedies that had been available to the prisoner were "properly" exhausted. 548 U.S. at 93. Prior to *Woodford* there were conflicting interpretations of the PLRA's exhaustion requirement. Some circuits interpreted the exhaustion requirement to mean that plaintiffs must have no more administrative remedies available before bringing their cases to federal court. *Id.* Others interpreted it to mean that plaintiffs must have "properly" exhausted their available remedies by following the agency's procedural requirements such as "deadlines and other critical procedural rules." *Id.*

6

In finding that exhaustion of remedies required "proper" exhaustion, the Court was persuaded by the "striking[]" similarities between the language of the PLRA and the doctrine of exhaustion in administrative law. *Id.* at 102. It also considered the purposes behind the exhaustion requirement, reasoning that an interpretation that did not require proper exhaustion would render the PLRA "toothless"–enabling a prisoner to bypass prison remedies by simply disregarding or ignoring deadlines. *Id.* at 95. "Proper exhaustion" means that the plaintiff complied with the administrative "agency's deadlines and other critical procedural rules." *Id*. at 90. Complaints and appeals must be filed "in the place, and at the time the prison's administrative rules require." *Id.* at 87 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002)).

In *Jones*, the Court instructs us to look to the prison's policy itself when determining "whether a prisoner has properly exhausted administrative remedies–specifically, the level of detail required in a grievance to put the prison and individual on notice of the claim." 549 U.S. at 205, 218 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the *prison's requirements*, and not the PLRA, that define the boundaries of proper exhaustion." (emphasis added)). Specifically, the *Jones* Court was determining whether a plaintiff needed to identify the defendant by name during the initial grievance process. Since the MDOC's policy at the time did not require that level of specificity the Court did not find that the PLRA required it. *Id.*[2]

A plaintiff does not need to show proper exhaustion as a part of their complaint. *Jones*, 549 U.S. at 216. Rather, failure to properly exhaust remedies is now an affirmative defense. *Id.*

**2.      Application and Analysis**

**a.      The Michigan Department of Corrections Grievance Policy**

---

[2] The MDOC has subsequently changed its policy, requiring that in order to properly exhaust remedies plaintiffs need to identify all defendants in the initial grievance that they later name in the subsequent federal complaint. *See infra.*

7

The MDOC provides prisoners with a grievance procedure for bringing forward their concerns and complaints. *See* MDOC Policy Directive ("PD") 03.02.130 (eff. July 9, 2007). The MDOC's grievance procedure consists of steps that a prisoner must follow prior to filing a complaint in court, and each step is accompanied by a time limit. First, the grievant must attempt to resolve the issue with the person involved "within two business days after becoming aware of a grievable issue, unless prevented by circumstances beyond his/her control..." MDOC PD 03.02.130(P).

If the initial attempt to resolve the issue with the person involved is impossible or unsuccessful, the inmate must then submit a Step I grievance form within five days. MDOC PD 03.02.130(v). If the grievance is accepted, the prison staff is required to respond in writing to a Step I grievance within fifteen days, unless an extension is granted. MDOC PD 03.02.130(X). If the inmate is not satisfied with the response, or does not receive a response within fifteen days, he must file a Step II appeal within ten business days. MDOC PD 03.02.130(BB). Once again, if the inmate is dissatisfied with the response at Step II or does not receive a Step II response within fifteen days, he has ten business days to submit a Step III appeal to the Prisoner Affairs Section. MDOC PD 03.02.130(FF). The Step III response concludes the administrative grievance process. According to MDOC policy, a grievance is not complete until the MDOC has responded to the Step III grievance. MDOC PD 03.02.130(B),(FF),(GG).

**b.      Analysis and conclusions**

*Woodford* and *Jones* require inmates to file grievances that conform to MDOC procedures in order to properly exhaust available remedies. 548 U.S. at 93; 549 U.S. at 218. Here, the focus is on whether Plaintiff exhausted his administrative remedies by properly filing a step III grievance. Defendants incorporate Defendant McCauley's motion for summary judgment, including the exhibits attached thereto. (Docs. 19, 40.) Defendants rely on the affidavit of Richard Russell, manager of the Grievance Section of the Michigan Department of Corrections (MDOC) in Lansing, Michigan. (Doc.

8

19, Ex. B, Russell Aff.) Russell provides a summary of how a step III grievance is handled by the Grievance Section of the Office of Legal Affairs. (*Id*. at 2-3.) Russell further testifies that "[he] caused a search of the database relevant to step III grievance appeals filed by the plaintiff and found that he has not filed the following grievance to the step III appeal process: SRF-2009-11 1713 12D1." (*Id*. at 3.)

Plaintiff, on the other hand, alleges that he filed a step III grievance appeal to the director's office on March 9, 2010, but has never received a response. (Doc. 1, Ex. O; *see also* Doc. 45 at 1-2.) Plaintiff attached, to his Complaint at Exhibit O, a grievance appeal form which he alleges to be the step III appeal that he mailed on March 9, 2010. (Doc. 1, Ex. O.) The document is dated March 9, 2010, and the reason listed under reason for the step III appeal is "Step II Response unacceptable[.]" (*Id*.) Defendants argue that "[i]f Plaintiff did not receive a response to his Step III appeal, his remedy was to follow up with the grievance office and inquire as to the status of his Step III grievance. He cannot simply claim he submitted a Step III appeal and therefore the grievance process is complete." (Doc. 40 at 19.)

In order to properly exhaust administrative remedies, Plaintiff must send the Step III appeal; Plaintiff is not responsible for what happens after the Step III appeal is sent and he has no burden to check for its receipt. *Fitts v. Snyder*, No. 12-13575, 2014 WL 1304637 at *3 (E.D. Mich. March 31, 2014)(denying motion to dismiss based on failure to exhaust where plaintiff sent the Step III appeal in conformance with the policy directive, noting the plaintiff has no control over when prison affairs actually receives it). Defendants have met their burden to support their motion with an affidavit from the grievance administrator and database that no Step III grievance was received; however, Plaintiff has also met his burden to come forward with some evidence through his affidavit (Doc. 45 at 1-2) and in Exhibit O (Doc. 1) to show that he sent the Step III grievance form in compliance with the policy directive. I therefore suggest that a genuine issue of material fact exists as to whether Plaintiff's claims

are properly exhausted. *Cf., August v. Caruso*, No. 12-13775, 2013 WL 5291577 at *5 (E.D. Mich. Sept. 19, 2013)(recommending granting summary judgment where plaintiff lacked any evidence that he sent the Step III appeal and where defendant provided the Step III tracking database showing no Step III grievance was ever received)(adopted on December 24, 2013).  I therefore recommend that Defendants' motion be denied.

**E.     Conclusion**

For all the reasons stated above, I suggest that Defendants' Motion be **DENIED.**


**III.    REVIEW**

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response

proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.


Date: August 15, 2014    /S PATRICIA T. MORRIS
                         Patricia T. Morris
                         United States Magistrate Judge


## CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date using the Court's CM/ECF system which delivers a copy to all counsel of record. A hard copy was served by first class mail on Donald Lowe, #172332, Central Michigan Correctional Facility, 320 N. Hubbard, St. Louis, MI, 48880

Date: August 15, 2014    By    s/Jean L. Broucek
                         Case Manager to Magistrate Judge Morris

11